MICHAEL, Circuit Judge,
dissenting:
Since 1980 no minority candidate has been elected to Alamance County’s five-member Board of Commissioners. Indeed, since the Voting Rights Act was first passed in 1965, only one minority candidate has ever been elected to the Board of Commissioners. That candidate was initially appointed (not elected), and when he was first elected after his appointment, he ran in a special election that was not subject to Alamance County’s at-large voting system. In light of this history, I believe that members of the black community in Alamance County would be truly surprised to learn that they enjoy the same opportunity as white voters to elect their preferred candidates as county commissioners. Yet, in light of this same history, the majority concludes that the plaintiffs have failed to demonstrate that minority-preferred candidates are usually defeated by white bloc voting and affirms the award of summary judgment to the County.
The majority offers two main reasons for its decision. First, the majority believes that the plaintiffs have failed to defeat the County’s motion for summary judgment because the plaintiffs have not “proffer[ed] data from a sufficient number of elections to enable the district court to determine whether white bloc voting usually defeats minority-preferred candidates.” Ante at 606. That is, because the plaintiffs have not proffered evidence from elections in which no minority was a candidate, the County is entitled to judgment as a matter of law. The majority reaches this conclusion even though the plaintiffs have proffered election data from every election in which a minority was a candidate, and even though the Supreme Court in Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), upheld a finding of vote dilution based on an analysis of election data that included results from only those elections in which a minority was a candidate and that covered only three election years.
Second, the majority believes that even if we only consider the election data that the plaintiffs have proffered, the plaintiffs have still failed to establish a violation of section 2 of the Voting Rights Act, 42 U.S.C. § 1973. In particular, under the majority’s approach for determining who is and who is not a minority-preferred candidate, the plaintiffs have failed to show that minority voters’ preferred candidate is usually defeated by white bloc voting. In reaching this conclusion, the majority adopts a methodology that is unsound and unsupported by precedent. For example, even though primary election results provide a means for assessing minority voter preference without the effects of partisanship, under the majority’s approach it is improper to consider primary election data when determining who is and who is not a minority-preferred candidate in the general election. Ante at 614-615. Thus, according to the majority, we should take raw election data in isolation and disregard the probative value of considering general election data in conjunction with primary election data (or in conjunction with any other circumstance in most cases).
Because I believe that neither of the majority’s two reasons provide grounds for affirming the district court’s grant of summary *621 judgment, I respectfully dissent. At the very least, I believe that it is clear that the plaintiffs have offered ample evidence showing that there is a genuine issue of material fact of whether minority-preferred candidates are usually defeated by white bloc voting. Therefore, the district court’s order granting summary judgment should be reversed and the case remanded for trial.
I.
The Supreme Court’s decision in Gingles makes clear that the plaintiffs have the burden of proving each of the Court’s three preconditions, see Gingles, 478 U.S. at 48, 106 S.Ct. at 2765, including whether “the white majority votes sufficiently as a bloc to enable it — in the absence of special circumstances, ... usually to defeat the minority’s preferred candidate.” Id. at 51, 106 S.Ct. at 2766-67 (citations omitted). And the plurality opinion of Justice Brennan emphasizes that “it is the status of the candidate as the chosen representative of a particular racial group, not the race of the candidate, that is important.” Id. at 68, 106 S.Ct. at 2775 (Brennan, J., plurality opinion) (emphasis in original).[1] Yet, the Court’s decision in Gin-gles notes that:
The number of elections that must be studied in order to determine whether voting is polarized will vary according to pertinent circumstances. One important circumstance is the number of elections in which the minority group has sponsored candidates. Where a minority group has never been able to sponsor a candidate, courts must rely on other factors that tend to prove unequal access to the electoral process. Similarly, where a minority group has begun to sponsor candidates just recently, the fact that statistics from only one or a few elections are available for examination does not foreclose a vote dilution claim.
Id. at 57 n. 25, 106 S.Ct. at 2769 n. 25; see Jenkins v. Red Clay Consol. School Dist. Bd. of Educ., 4 F.3d 1103, 1130 (3d Cir.1993) (“The Supreme Court’s language clearly indicates that an inability to offer statistical evidence on a large number of elections should not foreclose a voting rights claim.”) cert. denied, — U.S. -, 114 S.Ct. 2779, 129 L.Ed.2d 891 (1994); Citizens for a Better Gretna v. City of Gretna, 834 F.2d 496, 502 (5th Cir.1987) (“Gingles ... suggests flexibility in the face of sparse data.”), cert. denied, 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989).
Accordingly, the plaintiffs here, faced with the prospect of having to establish their vote dilution claim at trial, conducted a statistical analysis of all general and primary elections since 1972 in which a minority candidate was on the ballot for county commissioner. In total, the plaintiffs proffered election data from five general elections and six primary elections extending over twenty years. The election data included the general elections in *622 1974, 1976, 1980, 1984, and 1986, and the Democratic primaries in 1972, 1976, 1978, 1980, 1984, and 1992. See Gingles, 478 U.S. at 57, 106 S.Ct. at 2769 (“a pattern of racial bloc voting that extends over a period of time is more probative of a claim that a district experiences legally significant polarization than are the results of a single election”).
In turn, the County proffered no election data of its own. Instead, the County moved for summary judgment arguing that the plaintiffs’ own election data fails to support their contention that the minority group’s preferred candidates are usually defeated by bloc voting among white voters of Alamance County. Neither before the district court, nor in its briefs to this court, did the County argue that it was entitled to summary judgment because the plaintiffs had only analyzed elections involving minority candidates. In essence, however, that is what the majority has held here today.
I disagree with this result because I believe that the plaintiffs have in fact offered sufficient evidence from which a fair assessment can be made of whether minority-preferred candidates are usually defeated by white bloc voting. In addition, I believe that if the County wishes to rebut the plaintiffs’ evidence of racial polarization based on evidence from elections in which no minority was a candidate, then the County should have the burden to produce such evidence.[2] I will elaborate on each of these points below.
A.
No court before today has ever dismissed a vote dilution claim because the plaintiffs failed to proffer evidence of elections in which no minority was a candidate. And, of course, the majority does not expressly say that is what it is doing here. According to the majority, it “hold[s] merely that it is insufficient to consider selectively only those elections in which minority candidates were on the ballot, at least where such elections are not such a substantial majority of the total elections that a fair assessment can be made of whether the minority-preferred candidates are usually defeated by white bloc voting.” Ante at 611. Yet, the majority makes clear that it believes that “both elections in which the candidates are of the same race and elections in which the candidates are of different races must be considered in order to determine whether white bloc voting usually defeats the minority-preferred candidate....” Id. at 607 (emphasis added).
Of course, I agree that there must be sufficient election data presented from which a “fair assessment can be made” of the third Gingles precondition. I cannot, however, agree that a “fair assessment” must be based on data from a “substantial majority of the total elections.” Nor can I agree that elections in which no minority was a candidate must be considered in all circumstances.
Despite what the majority believes, there is no requirement under section 2 of the Voting Rights Act or Supreme Court precedent that the plaintiffs offer election data from “a substantial majority of the total elections” in order to show that minority-preferred candidates are usually defeated by white bloc voting. Likewise, even though “a minority-preferred candidate may be either a minority or a non-minority,” neither section 2 of the Voting Rights Act nor Supreme Court precedent requires, as the majority claims, that we “must” consider (and plaintiffs must proffer) data from elections in which no minority was a candidate. See ante at 607. As I have said, not only did the decision in Gingles uphold vote dilution claims based on election data that included only those elec *623 tions in which a minority was a candidate, but the Court specifically noted that “[t]he number of elections that must be studied in order to determine whether voting is polarized will vary according to the pertinent circumstances.” 478 U.S. at 57 n. 25, 106 S.Ct. at 2769 n. 25 (emphasis added). And no court (at least before today) has ever said that there is a per se rule requiring that election data from elections in which no minority was a candidate “must” be proffered. Cf. Sanchez v. Bond, 875 F.2d 1488, 1495 (10th Cir.1989) (“We do not believe that a per se rule against examining races that have only white candidates is implicit in Gingles") (emphasis added), cert. denied, 498 U.S. 937, 111 S.Ct. 340, 112 L.Ed.2d 305 (1990).[3]
This makes complete sense. While minority voters might prefer a candidate from the majority (i.e., white) group, common experience shows that minority voters frequently prefer minority candidates. The opposite is true as well. Gingles, 478 U.S. at 68, 106 S.Ct. at 2775 (Brennan, J., plurality opinion) (“Because both minority and majority voters often select members of their own race as their preferred representatives, it will frequently be the case that a black candidate is the choice of blacks, while a white candidate is the choice of whites.”) (citation omitted); Jenkins, 4 F.3d at 1126 (“experience does demonstrate that minority candidates will tend to be candidates of choice among the minority community”).
Moreover, even though voter preference is what matters, minority sponsorship of a candidate is the basis for determining whether a candidate is minority preferred. Of course, sponsorship can be proven in a number of different ways, and election data is only one of them. However, when a defendant neither argues nor proffers evidence that the minority has sponsored such a significant number of white candidates that a fair assessment can not be made without an analysis of election data from elections in which no minority was a candidate, I do not believe that we may require a plaintiff to proffer election data from white/white elections before a vote dilution claim can be proven.
Indeed, when the minority’s only choice is to vote for a white candidate or not to vote at all, such elections are, in general, less probative on the issue of racial polarization than elections involving both black and white candidates. As the Fifth Circuit has said:
“[Tjhe evidence most probative of racially polarized voting must be drawn from elections including both black and white candidates.” “[Wlhen there are only white candidates to choose from it is “virtually unavoidable that certain white candidates would be supported by a large percentage ... of black voters.’ ” Thus, it is not particularly surprising — and not particularly probative — that analysis of elections that included only white candidates did not reveal any racial polarization.
Westwego Citizens for Better Gov’t v. City of Westwego, 946 F.2d 1109, 1119 n. 15 (5th Cir.1991) (Westwego III) (citations omitted; quoting Westwego I, 872 F.2d 1201, 1208 n. 7 (5th Cir.1989); Citizens for a Better Gretna v. City of Gretna, 834 F.2d 496, 502 (5th Cir.1987), cert. denied, 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989)); see ante at 610 (listing eases in which courts have held that black/white elections are more probative *624 than white/white elections). Therefore, if the defendant does not bring forth evidence of particular circumstances showing that minority voters often choose to sponsor, Gingles, 478 U.S. at 57 n. 25, 106 S.Ct. at 2769 n. 25, and not merely vote for white candidates, I believe that “a fair assessment can be made” of the third Gingles precondition without the proffer of election data from elections in which no minority was a candidate,
A fair assessment is just that, and the plaintiffs in this case have offered more than sufficient election data from which we may discern election patterns in Alamance County. The plaintiffs’ election data spans the twenty years preceding the filing of the plaintiffs’ complaint in October of 1992. During those twenty years, there were ten county commissioner elections, and of those ten elections the plaintiffs have offered election data from five general elections and six primary elections. In other words, the plaintiffs have offered election data from a majority of the county commissioner elections held within the two decades preceding the filing of their complaint. I believe it is clear that the proffer of such extensive election data as this satisfies the plaintiffs’ burden to produce sufficient election data from which a fair assessment can be made. See, e.g., Gingles, 478 U.S. at 61, 106 S.Ct. at 2772 (concluding that “the District Court’s approach, which tested data derived from three election years in each district, and which revealed that blacks strongly supported black candidates, while, to the black candidates’ usual detriment, whites rarely did, satisfactorily addresses each faeet of the legal standard”); Uno v. City of Holyoke, 72 F ,3d 973, 985 (1st Cir.1995) (“race-conscious politics (or its absence, for that matter) can more readily be seen by producing a documentary that spans a series of elections than by taking an isolated snapshot of a single election”).
B.
While the plaintiffs have the burden of proving the Gingles preconditions, nothing prevents the defendant from offering election data of its own. And, as I have said, black/ white elections are generally more probative than white/white elections. It therefore follows that if the plaintiffs have proffered election data sufficient to provide a “fair assessment” of the third Gingles precondition, and that election data only involves black/white elections, the defendant is free to counter with evidence of election data from elections in which no. minority was a candidate. As the Third Circuit has said:
We ... do not believe that plaintiffs are required to present evidence on white versus white elections if they do not believe that those elections are probative. If the defendants want to introduce evidence on those elections in an attempt to rebut the plaintiffs’ evidence of cohesiveness or white bloc voting, they may do so. Nevertheless, because white versus white elections tend to be less probative, there may still be eases in which “[t]he evidence of polarized voting ... is so strong ... that it cannot be overcome even when all reasonable inferences are accorded to the evidence of elections involving only white candidates.”
Jenkins, 4 F.3d at 1128-29 (quoting Smith, 687 F.Supp. at 1817); see Uno, 72 F.3d at 988 & n. 8 (noting that when district court only examined elections involving minority candidates, “evidence exhumed from “white only’ elections may still be relevant in assessing the totality of the circumstances in a vote dilution case, especially if it tends to rebut the evidence of cohesion or white bloc voting extracted from ‘mixed’ elections”) (emphasis added; citation omitted).
In this case, the County offered no evidence from white/white elections. And, in fact, the County has not even argued that such elections are probative. Accordingly, the majority is simply wrong to uphold the district court’s decision granting summary judgment because the plaintiffs have not offered evidence from elections in which no minority was a candidate.
II.
The majority is also wrong to conclude that if we only consider the election data that the plaintiffs have proffered from black/white elections, the plaintiffs have still failed to establish h violation of section 2 of the Voting Rights Act, 42 U.S.C. § 1973. Ante at 606. *625 In particular, I believe that the majority’s (and the district court’s) methodology for determining who is and who is not a minority-preferred candidate is fundamentally flawed and that the County is not entitled to summary judgment when the election data put forth by the plaintiffs is properly considered.
Initially, I emphasize that the majority opinion does not squarely address the issue of the procedural posture of this case. We are hearing this case on appeal from the district court’s grant of summary judgment in favor of the County, and not after a trial on the merits. Therefore, it is the moving party (i.e., the County) that has the burden of showing that there is no genuine issue of material fact requiring a trial, and we must draw all reasonable inferences in favor of the nonmoving party (i.e., the plaintiffs). In addition, while the plaintiffs here bear the ultimate burden of persuasion on their vote dilution claim, the County must show that there is an absence of evidence to support the plaintiffs’ claim in order to succeed on summary judgment. See, e.g., Marylanders for Fair Representation, Inc. v. Schaefer, 849 F.Supp. 1022, 1030 (D.Md.1994) (three-judge court) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986)). And while we have previously said that plaintiffs in a vote dilution case cannot “pass the summary judgment threshold” unless they establish all the Gingles preconditions, McGhee v. Granville County, 860 F.2d 110, 117 (4th Cir.1988) (internal quotes and citation omitted), I believe that the plaintiffs here have adequately established the Gingles preconditions for purposes of defeating the County’s motion for summary judgment.[4]
Moreover, because we are reviewing this case on summary judgment, I do not believe that the district court’s factual findings are entitled to deference. The district court assessed a paper record, and we should, as we normally do on summary judgment, review the court’s findings de novo. Cf. ante at 614-615, 616-617 (upholding district court’s factual findings under the clearly erroneous standard of Rule 52(a) of the Federal Rules of Civil Procedure).[5]
Of course, the legal standards that the district court applied are not entitled to any deference. And even if there had been a trial on the merits in this case, we would still have the “power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law.” Gingles, 478 *626 U.S. at 79, 106 S.Ct. at 2781 (internal quotes and citations omitted). Accordingly, I turn now to the errors of law that infected the district court’s decision in this case — errors that the majority has simply compounded.
A.
The plaintiffs challenge the methodology employed by the district court on several grounds. First, the plaintiffs argue that the district court erred “[b]y grouping together white candidates for whom black voters voted only in the absence of other alternatives with candidates who were enthusiastically and overwhelmingly supported by black voters (and who were, with one exception, black)_” Appellants’ Brief at 16. According to the plaintiffs, the fact that many white Democratic candidates received substantial electoral support from black voters in general elections does not show that these candidates are minority preferred. Rather, it is a reflection of the fact that when the only electoral choice is to vote for a white Republican or a white Democrat, blacks in Alamance County usually choose the white Democrat. Therefore, the district court should have conducted an individualized assessment of each candidate that received a majority of the minority’s support in the general election to determine if that candidate was truly minority preferred. For example, the district court should have examined primary election results (nominating elections where the effects of partisan voting are minimized) to determine the black community’s true level of support for a particular candidate.
Second, while the district court failed to examine primary elections to help determine who is and who is not minority preferred, the plaintiffs argue that the district court erred because it equated success in primary elections with success in general elections. This, according to the plaintiffs, is wrong because “winning the primary does not place the winner in office.” Id. at 26.
Finally, the plaintiffs believe that the district court erred because it failed to discount the three election victories of Jack O’Kelley, the only black candidate ever elected to Ala-mance County’s Board of Commissioners. Id. at 26. In particular, the plaintiffs contend that the district court should not have counted O’Kelley’s election victories because O’Kelley first gained office by appointment, not election. In other words, unlike every other county commissioner, O’Kelley has always been an incumbent. Thus, the factual circumstances surrounding his election victories are not typical, and they provide little guidance for determining whether white bloc voting usually defeats the minority’s preferred candidate.
The majority disagrees with much of what the plaintiffs argue, though to its credit the majority does correctly recognize that “primary and general elections results should not be aggregated for purposes of determining whether black-preferred candidates are ‘usually’ successful....” Ante at 616. Thus, the majority evidently agrees with the plaintiffs that even though a minority-preferred candidate wins in the primary, this success alone does not count for purposes of determining whether the minority is usually able to elect its preferred candidates to office. And I too agree on this point.
Nevertheless, I cannot agree with the majority’s conclusions with respect to the plaintiffs’ other assigned errors. According to the majority, the district court actually “erred in plaintiffs’ favor by not treating as ‘black-preferred’ some ... candidates who placed second or third among black voters (and with a significant majority of black votes) behind an unsuccessful candidate who was the first choice of black voters.” Ante at 611-612. Also, the majority believes that the district court did not err when it failed to conduct an individualized determination of candidates who placed second or third among minority voters when the minority’s first choice was successful. Ante at 614-616. Furthermore, the majority rejects the plaintiffs’ argument that primary election results provide a basis to help determine whether a candidate is minority preferred in the general election. See ante at 614-616. And the majority believes that the district court did not err in giving full weight to the three election victories of Jack O’Kelley. Ante at 617.
*627 I believe that in reaching these conclusions the majority has seriously misread the Supreme Court’s decision in Gingles, our own precedent, and precedent from our sister circuits. As I explain below, the critical error that both the majority and the district court make is to isolate election data from the actual circumstances surrounding an election and then to treat such data as dispositive for purposes of determining who is a minority-preferred candidate (though, under most circumstances, the majority does not treat the data as dispositive for purposes of determining who is not a minority-preferred candidate).[6] Granted, election data (taken in isolation) provides some guidance in making a determination of who is and who is not a minority-preferred candidate. However, both section 2 of the Voting Rights Act and Gingles demand a more searching inquiry than mere reference to the percentage of minority voter support that a candidate has received, particularly when the candidate is not a minority and an at-large voting system is employed. At the very least, we must examine the particular circumstances of each ease to discern whether the electoral support that minority voters give a candidate (especially in general elections) truly reflects minority voters’ preference or whether such support is itself a manifestation of a structural inequality in the challenged voting system.
1.
We have covered much of this ground before. See Collins v. City of Norfolk, 883 F.2d 1232 (4th Cir.1989) (Collins II), cert. denied, 498 U.S. 938, 111 S.Ct. 340, 112 L.Ed.2d 305 (1990).[7] At-large voting schemes may work to create the appearance of minority preference where none actually exists because once the number of seats up for election exceeds the number of candidates that minority voters “prefer,” minority voters face the choice of either voting for a candidate that they do not actually prefer or not voting at all. Thus, the fact that a candidate receives a majority of the minority vote does not automatically make that candidate a minority-preferred candidate for purposes of the third Gingles precondition. As we explained in Collins II:
The mere election of a candidate who appears' to have received votes from more than fifty percent of minority ballots does not count as a minority electoral success, when each ballot may contain votes for more than one candidate. In such a situation, if there were other candidates, preferred by a significantly higher percentage of the minority community, who were defeated in the same election, then it cannot fairly be said that the minority community has successfully elected representatives of its choice. Each situation must be reviewed individually to determine whether the elected candidates can be fairly considered as representatives of the minority community. The presumption must be that they cannot, if some other candidate has received significantly more minority votes.
883 F.2d at 1238 (emphasis added; quoting Collins I, 816 F.2d 932, 937 (4th Cir.1987)).
*628 Collins II thus demands a two-step inquiry. In the first step we decide whether there is a presumption that a candidate is or is not minority preferred. When an unsuccessful candidate receives a significantly higher percentage of the minority vote than candidates who win election with a majority of the minority vote, the elected candidates are presumed not to be minority preferred. When, however, an unsuccessful candidate receives a percentage of the minority vote which is not significantly higher than that of the elected second- and third-place finishers, we presume that the second- and third-place finishers are minority preferred. Either way, however, the election data only creates a presumption.
In the second step of the inquiry the district court must determine whether the presumption is supported by other facts. The court must make an individualized determination of “whether the elected candidates can be fairly considered as representatives of the minority community.” Depending on the outcome of the first step, there may be a presumption for or against finding that a candidate is minority preferred, but regardless of the presumption the district court must make an individualized determination in “[e]ach situation.” Such an individualized determination is required, because as both Congress and the Supreme Court recognize, “whether the political processes are equally open depends upon a searching practical evaluation of the past and present reality, and on a functional view of the political process.” S.Rep. No. 417, 97th Cong., 2d Sess. 30 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 208; Gingles, 478 U.S. at 45 & 79, 106 S.Ct. at 2763-64 & 2781.
The majority recognizes that Collins II demands a two-step inquiry. See ante at 612. The majority, however, misconstrues the inquiry.
Under the first step, according to the majority, a second- or third-place finisher is minority preferred if the unsuccessful first choice received a percentage of the minority vote which is not significantly higher than that of the elected second- and third-place finishers. Id. In this situation, the majority believes that a district court need not (and evidently cannot) proceed to the second step of the inquiry in order to make the individualized determination required under the Act and Gingles. Id. at 613 (“Because [unsuccessful candidate] Morris’ support among black voters was not ‘significantly higher’ than [successful candidate] Long’s, the district court appears to have erred in not automatically treating Long as a black-preferred candidate.”) (emphasis added).
Needless to say, cutting off the inquiry at the first step makes a court’s “searching practical evaluation of the past and present reality” dependent exclusively upon election results taken in isolation. Yet, because at-large voting systems often fail to provide an accurate view of the political process (among other things, they may create the appearance of minority preference), I believe that a court must proceed to the second step of the inquiry even when “the unsuccessful first choice among minority voters did not receive a ‘significant higher percentage’ of the minority community’s support.”
Of course, when the level of support received by the unsuccessful first-place finisher among minority voters is “significantly higher” than the support given the second- and third-place finishers by those same voters, the majority agrees that only a presumption is created against finding that the second- and third-place finishers are minority preferred. Id. at 613 (asserting that “we held in Collins II (sic) only that successful candidates who receive more than 50% of the black vote should not automatically be viewed as a black-preferred candidate if they receive significantly less support from black voters than another, losing candidate, not that they should never be treated as black-preferred”) (emphasis in original). I fail, however, to discern any reason for creating the presumption (and proceeding to the second step) only when an unsuccessful first-place finisher receives a significantly higher percentage of the minority vote, and neither the Act, nor angles, nor Collins II supports the majority’s conclusion to the contrary.
For much the same reason, the majority is also wrong to conclude that “any candidate who receives a majority of the minority vote and who finishes behind a successful candi *629 date who was the first choice among the minority voters is automatically to be deemed a black-preferred candidate.....” Ante at 614 (emphasis in original). Indeed, under the majority’s theory even when a successful minority-preferred candidate garners significantly higher minority support than successful second- and third-place finishers (who receive over 50 percent of the minority vote), a district court must automatically treat the successful second- and third-place finishers as minority-preferred candidates. And, in fact, the majority goes so far as to conclude that even though a candidate fails to gain a majority of the minority vote, there is a presumption that the candidate is minority preferred provided that the candidate would have won a seat in an at-large election among black voters. Id. at 614 (stating that “[cjandidates who receive less than 50% of the minority vote, but who would have been elected had the election been held only among black voters, are presumed also to be minority-preferred candidates, although an individualized assessment should be made in order to confirm that such a candidate may appropriately be so considered”). That has never been the law, nor should it be.[8]
The only way that the majority can reach these conclusions is to disregard our clear language in Collins II and other precedent throughout the circuits. These are decisions that hold that a successful candidate is not automatically minority preferred merely because that candidate receives more than 50% of the minority vote. And these are decisions that either hold or assume that a candidate who receives less than 50% of the minority vote cannot (by definition) be minority preferred. As we stated in Collins II:
The district court’s error in finding successful candidates who received over 50% of the minority vote to be the chosen representatives of the minority community, despite the fact that other candidates received a much greater percentage of the minority vote, is not simply technical or semantic....
A moment’s reflection shows how the district court’s method of identifying the black community’s representatives of choice defeats a primary purpose of the Act. In 1974, 21 candidates sought the 4 open seats on the council. In 1980, 12 candidates vied for 3 open seats. In 1974, each voter — black and white — could cast four votes and in 1980 three votes. If black voters exercised their right to cast all of their allotted votes, they ran the risk that their second and third choices would be declared their preferred candidates. Only by single-shot voting — withholding all votes save for their first choice, and forfeiting the opportunity to cast all votes allotted to each voter — could the minority be assured that its second and third choices would not be declared its preferred candidates. In contrast, under the at-large system, the white voters can freely east all votes allotted to them without suffering the penalty imposed on the minority voters. The district court’s construction of the Act defeats the congressional purpose of assuring that the opportunity to participate in the electoral process is open to all citizens.
We are aware of no case that supports the district court’s construction of the Act. 883 F.2d at 1239-40 (emphasis added); see NAACP v. Niagara Falls, 65 F.3d 1002, 1019 (2d Cir.1995) (“a candidate cannot be *630 ‘minority-preferred’ if that candidate receives support from fewer than 50% of minority voters.”) (emphasis added); id. (“even if a candidate receives 50% or more of the minority vote, a court need not treat the candidate as minority-preferred if another candidate receives significantly higher supr port”); Jenkins, 4 F.3d at 1126 (“it is important to look beyond whether a white candidate received a majority of the minority community’s vote and determine whether that white candidate is truly the minority community’s representative . of choice”); Campos v. City of Baytown, 840 F.2d 1240, 1245 (5th Cir.1988) (rejecting the argument that “any time a candidate gets a majority of the minority votes he is the ‘chosen representative’ of the minority group”), cert. denied, 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989). See also Uno, 72 F.3d at 989 (“[Djetermining whether racial bloc voting exists is not merely an arithmetic exercise that consists of toting up columns of numbers, and nothing more. To the contrary, the district court should not confine itself to raw numbers, but must make a practical, commonsense assay of all the evidence.”) (citations omitted).
The effect of the majority’s unprecedented decision will be to -undermine the Voting Rights Act. After today, structural inequalities that may be at work in at-large voting systems will be masked by the structure itself, perpetuating those very inequalities that the Act is intended to remedy. The reason for this is simple. As I have explained, at-large voting systems may work to create the appearance of minority preference where none actually exists. Thus, to allow election results alone to dictate whether a candidate is minority preferred is to validate the structural inequalities which may be present in at-large voting systems based on the system itself. That is circular reasoning, I believe.
We are bound to follow Collins II. In sum, therefore, we should hold that a district court must always make an individualized determination of whether any second- or third-place finisher who receives a majority of the minority vote is actually minority preferred. When a minority-preferred candidate (whether successful or not) receives a significantly higher percentage of the minority vote, we must presume that the second- or third-place finisher who receives a majority of the minority vote is not minority preferred. When a minority-preferred candidate (whether successful or not) does not receive a significantly higher percentage of the minority vote, we must presume that the second-or third-place finisher is minority preferred, provided that the second- or third-place finisher received a majority of the minority vote. And when any candidate receives less than a majority of the minority vote, that candidate can never be deemed minority preferred.
2.
I also believe that it is clear that when making an individualized determination of who is and who is not a minority-preferred candidate, a district court must examine the particular facts and circumstances surrounding each election and candidate in order to ascertain which, if any, candidate or candidates the minority community has sponsored. See Gingles, 478 U.S. at 57 n. 25, 106 S.Ct. at 2769 n. 25. In other words, the district court must look at the totality of the circumstances in each situation.
There is nothing unique about this approach, and depending on the facts, it may help or hurt plaintiffs’ ability to prevail in a vote dilution case. See, e.g., Uno, 72 F.3d at 989 (criticizing district court for failing to take into account city’s “rapidly changing political environment” which may have allowed the minority group to sponsor successful candidates); Jenkins, 4 F.3d at 1129 (“In deciding which, if any, of the white candidates were minority preferred, the court must engage in a detailed, practical evaluation of the extent to which any particular white candidate was, as a realistic matter, the minority voters’ representative of choice.”); Collins II, 883 F.2d at 1238 (“in addition to the bare statistics, it is appropriate to consider testimony revealing how political observers and the candidates themselves viewed the city’s claim that [the candidates] were the minority’s preferred candidates and representatives of choice”); Smith, 687 F.Supp. at 1316-17 (emphasizing that “con *631 siderable weight” should be given to elections between black and white candidates, but still examining multiple factors to determine minority voters’ representatives of choice).
Because we should examine the totality of the circumstances, a district court should not hesitate to look at any evidence that might be probative. Accordingly, I can not agree with the majority that primary election results do not bear on the question of who is and who is not a minority-preferred candidate. See ante at 614—616. Cf. Niagara Falls, 65 F.3d at 1019 (“When a candidate receives support from 50% or more of minority voters in a general election, a court need not treat the candidate as minority-preferred when another candidate receiving greater support in the primary failed to reach the general election.”); Sanchez, 875 F.2d at 1496 (examining totality of the circumstances, including “testimony to the effect that no candidate could secure the Democratic slot in county races without the support of a group of Hispanics that included some of the plaintiffs”). Moreover, I believe that while the race of the candidate is not disposi-tive, it too is a fact which in the totality of the circumstances the court may consider. See Jenkins, 4 F.3d at 1129. Again, “whether the political processes are equally open depends upon a searching practical evaluation of the past and present reality, and on a functional view of the political process.” S.Rep. No. 417, 97th Cong., 2d Sess. 30 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 208; Gingles, 478 U.S. at 45 & 79, 106 S.Ct. at 2763-64 & 2781. A district court should not therefore refrain from examining election data from primaries in order to help determine who is and who is not a minority-preferred candidate. Nor should the district court ignore the fact that minority voters often support minority candidates.
When, for example, a white candidate fails to gain a majority of the minority vote in the primary election (yet still wins nomination), the fact that such a candidate subsequently gains a majority of the minority vote in the general election is of minimal probative value. This is especially true when minority voters strongly support a losing minority candidate in the primary election process.[9] Simply put, while the majority may be correct to say that minority voters do, not “take their marbles and go home whenever the candidate whom they prefer most in the primary does not prevail,” ante at 615, the requirements of the Voting Rights Act are not met if “[cjandidates favored by blacks can win, but only if the candidates are white.” Smith, 687 F.Supp. at 1318.[10]
3.
As a district court must examine the totality of the circumstances to determine who is and who is not a minority-preferred candi *632 date, a district court must also examine whether “special circumstances” have resulted in a minority-preferred candidate winning a particular election or elections. Gingles, 478 U.S. at 51 & 57, 106 S.Ct. at 2766-67 & 2769-70. In such a case, a claim of vote dilution may still succeed because a pattern of racial bloc voting may still result in the defeat of minority-preferred candidates under normal election conditions. See id. at 57, 106 S.Ct. at 2770 (“the success of a minority candidate in a particular election does not necessarily prove that the district did not experience polarized voting in that election; special circumstances, such as the absence of an opponent, incumbency, or the utilization of bullet voting, may explain minority electoral success in a polarized contest”) (footnote omitted).
Here, for example, I believe that the district court erred when it counted as minority electoral success all three election victories of black candidate Jack O’Kelley. At the very least the district court should have discounted O’Kelley’s first election victory in 1974. That election and the candidacy of O’Kelley were atypical for two reasons. First, O’Kelley was initially appointed (not elected) to fill a vacant slot on the Board of Commissioners. He thus ran as an incumbent even though he had never been elected. Second, and more importantly, the 1974 general election was both a special election for the seat to which O’Kelley had previously been appointed, and it was an at-large election for two other seats on the Commission. And, of course, O’Kelley ran in the special election, not the at-large election. Thus, I would hold that as a matter of law O’Kelley’s incumbency, coupled with his appointment and the unique nature of his 1974 election, constitute special circumstances requiring that we discount this election victory.
As for O’Kelley’s second and third elections in 1976 and 1980, it may or may not be appropriate to count these elections as instances where the minority was successful in electing its preferred candidate. Because of the odd nature of the 1974 election, O’Kelley was forced to run for reelection after only two years (not the normal four years). Accordingly, there is evidence that “special circumstances” exist that also might require us to discount O’Kelley’s 1976 election. As for the 1980 election, the effects of O’Kelley’s initial appointment, coupled with his incumbency, may still persist. And, as the Court in Gingles expressly recognizes, incumbency may constitute a special circumstance in certain situations. 478 U.S. at 57, 106 S.Ct. at 2769-70. Accordingly, because we hear this case on an appeal from summary judgment, I would hold that there are genuine issues of material fact as to whether O’Kelley’s second and third election victories should be counted for purposes of Gingles ’ third precondition. These fact issues should be resolved at trial, after the district court has examined the totality of the circumstances surrounding O’Kelley’s second and third election victories.
B.
In light of the proper methodology described above, I turn now to examine the election data that the plaintiffs have proffered. Of course, because there has been no trial, and thus no “individual determinations” of who is and who is not a minority-preferred candidate, the district court’s grant of summary judgment should be reversed for this reason alone. In addition, even if we merely examine the election data, I believe it clear that the presumptions we recognized as appropriate in Collins II indicate that minority-preferred candidates have rarely been successful. I would therefore hold that there is a genuine issue of material fact as to whether minority-preferred candidates are usually defeated by white bloc voting and that the case should be remanded for trial.

The 1972 Election:

In 1972 Morris (a black candidate) received 98% of the black vote in the Democratic primary but was defeated nonetheless. Long (a white candidate) received 84% of the black vote and was nominated. No other candidate received a majority of the minority vote. Thus, assuming that 98% of the vote is not “significantly higher” than 84% of the vote, there is a presumption that we have two minority-preferred candidates — one of whom we know lost (Morris). Because neither party has proffered election data from the 1972 general election, it would appear *633 that we cannot determine whether Long was successful or not in the general election. However, candidate Long also ran in the 1974 election. It is thus apparent that Long was not elected in 1972. Accordingly, we may presume that minority voters were not able to elect either of their preferred candidates in 1972.

The 197k Election:

The parties have failed to provide the primary results from the 1974 Democratic primary, but Newlin (a white candidate) won the general election with 99% of the black vote, and Long lost with 99% of the black vote. I will therefore count Newlin as a successful minority-preferred candidate and Long as an unsuccessful minority candidate (though again the record is incomplete on this point). Also, as I have said, O’Kelley’s election is not counted because he had recently been appointed to the Board of Commissioners, and he was running to fill a single vacant seat. Thus, as of 1974 there is a presumption that there had been four minority-preferred candidates, one candidate who was elected and three candidates who were not.

The 1976 Election:

In 1976 only O’Kelley received the support of a majority of black voters in the Democratic primary election. Therefore, he is the only candidate that should be presumed minority preferred. But again, because O’Kelley did not serve a full term after his 1974 election, it may be inappropriate to count his success in the general election. Thus, as of 1976 there still had been only four minority-preferred candidates, only one of whom was elected.

The 1978 Election:

In the 1978 Democratic primary, Harris (a black candidate) received 78% of the black vote but was not nominated, and Newlin (a white candidate) received 60% of the black vote and was nominated. The majority does not disagree that Harris’s support among minority voters was significantly higher than Newlin’s support. See ante at 613-614. In addition, the district court reached the same conclusion. We should therefore presume that there was only one minority-preferred candidate in 1978 (Harris). Because he was unsuccessful, as of 1978 there had been five minority-preferred candidates, one candidate who was elected and four candidates who were not.

The 1980 Election:

In the 1980 Democratic primary, O’Kelley received 99% of the black vote and was nominated, and Fleming (a white candidate) received 57% of the black vote but was not nominated. No other candidate received a majority of the minority vote in the primary. Thus, for purposes of summary judgment I would not count either O’Kelley or Fleming as minority preferred. The effects of O’Kelley’s initial appointment (coupled with his incumbency) may still persist, though less so than in 1974 and 1976. And Fleming did not receive “significantly” close to the same amount of support as O’Kelley. Accordingly, as of 1980, there remained five minority-preferred candidates, one candidate who was elected and four candidates who were not.

The 1984 Election:

In the 1984 Democratic primary, Freeman (a black candidate) received 98% of the black vote and was nominated. Paris (a white candidate) received 50% of the black vote but was not nominated. Because Freeman’s minority support was significantly higher than Paris’s, I would presume that Paris was not a minority-preferred candidate. In the general election, Freeman lost. Therefore, as of 1984 there had been six minority-preferred candidates, one who was elected and five who were not.

The 1986 Election:

The parties have not provided primary results for 1986. In the general election, however, Bennett (a white candidate) won with 99% of the black vote. I will therefore count him as a successful minority-preferred candidate. However, Morris (a black candidate) lost the general election, though he got 57% of the black vote. Although Morris is a minority and received a majority of the minority vote, I will nonetheless presume that he is not a minority-preferred candidate because Bennett received significantly higher support. Therefore, as of 1986 we should presume that there had been seven minority- *634 preferred candidates, two who were elected and five who were not.

The 1992 Election:

In the 1992 Democratic primary, Torain (a black candidate) received 74% of the black vote in the primary but was not nominated. No one other candidate received a majority of the black vote. I thus presume that To-rain was the only minority-preferred candidate in 1992.
In total, therefore, we should presume that there have been eight minority-preferred candidates, two who were elected and six who were not. Accordingly, based only upon the election data proffered, I believe that the County is not entitled to summary judgment. See Gingles, 478 U.S. at 75, 106 S.Ct. at 2779 (“the language of § 2 and its legislative history plainly demonstrate that proof that some minority candidates have been elected does not foreclose a § 2 claim”). And, I reemphasize, this analysis only shows which candidate (whether black or white) the court should presume to be minority preferred. An individual determination as to each candidate should be made after trial to ensure that all minority-preferred candidates have been properly identified.
* * * * * *
It is no doubt true that we may not (and should not) simply assume that “ Voters of a particular race, because of their race, “think alike, share the same political interests, and will prefer the same candidates at the polls”.”’ Ante at 618 (quoting Miller v. Johnson, — U.S. -, -, 115 S.Ct. 2475, 2486, 132 L.Ed.2d 762 (1995) (quoting Shaw v. Reno, 509 U.S. 630, 647, 113 S.Ct. 2816, 2827, 125 L.Ed.2d 511 (1993))). Some black voters may prefer white candidates, some white voters may prefer black candidates, and most voters (I would hope) may not care if their preferred candidate is black or white. Still, a particular voting system may work to prevent black voters from having the same opportunity to elect their chosen representatives as white voters, and such a system violates the law. See Shaw, 509 U.S. at 652, 113 S.Ct. at 2829-30 (recognizing that a vote dilution claim is “analytically distinct” from a claim that the state has used race as a basis for separating voters into districts). Accord Miller, — U.S. at -, 115 S.Ct. at 2485-86.[11]
Here, the plaintiffs have proffered sufficient evidence to defeat the County’s motion for summary judgment because that evidence shows that a genuine question of fact exists as to whether the at-large method for electing commissioners in Alamance County deprives black voters of the same opportunity to elect representatives of choice as is enjoyed by white voters. The County may ultimately prevail on that question, but without a trial neither we, nor the County, nor the citizens of Alamance will know. Again, I respectfully dissent.

. Justice Brennan’s opinion on this point failed to gain a majority of the Court, and it was joined by only Justices Marshall, Blackmun, and Stevens. Justice White, who otherwise joined Justice Brennan’s opinion, rejected the notion that the race of the candidate is irrelevant. Id. at 83, 106 S.Ct. at 2783 (White, J., concurring). Justice O’Connor, in an opinion joined by Chief Justice Burger and Justices Powell and Rehnquist, agreed with Justice White that race of the candidate might affect the overall vote dilution inquiry. Id. at 101, 106 S.Ct. at 2792-93 (O’Con-nor, J., concurring). Justice White and Justice O’Connor were concerned that ignoring the race of the candidate may cause the successful election of a black candidate not to be counted for purposes of identifying racial polarization. For instance, because black voters often support the Democratic party, there was concern that the election of a black Republican candidate would not be viewed as a minority success. See id., 478 U.S. at 83, 106 S.Ct. at 2783 (White, J., concurring) (“This is interest-group politics rather than a rule hedging against racial discrimination."); id. at 101, 106 S.Ct. at 2792-93 (O'Connor, J., concurring) (agreeing with Justice White that “Justice Brennan’s conclusion that the race of the candidate is always irrelevant in identifying racially polarized voting conflicts with Whitcomb [v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971)] and is not necessary to the disposition of this case.”). Of course, the majority opinion in the present case turns the opinions of Justice Brennan, Justice White, and Justice O’Connor on their collective heads. That is, whereas the Supreme Court in Gingles was concerned with whether to count the election of a black Republican for purposes of identifying racial polarization, the majority holds that the plaintiffs’ action cannot withstand summary judgment because we must consider whether to count the election of white Democrats for purposes of identifying racial polarization.

. Also, I do not share the majority's uneasiness with the plaintiffs' reliance on bivariate regression analyses. See ante at 604 n. 3. If the County wishes to challenge the plaintiffs' statistical evidence as flawed, then it should do so, and we should refrain from criticizing the statistical evidence in the absence of such a challenge. For instance, while it may (or may not) be true that "blacks and whites who live in integrated neighborhoods are more likely to vote for candidates of another race,” id., the County has put forth no evidence or argument on this appeal that the plaintiffs’ election data is flawed because it treated minority preference as constant across precincts. Cf. Smith v. Clinton, 687 F.Supp. 1310, 1315 n. 6 (E.D.Ark.) (three-judge court) (noting that the defendants did not dispute the fact that a regression analysis is the “standard method for inferring the behavior of population groups from data collected for political units”) (internal quotes omitted), aff'd mem., 488 U.S. 988, 109 S.Ct. 548, 102 L.Ed.2d 576 (1988).

. The majority cites the decision in Brown v. Board of Commissioners, 722 F.Supp. 380, 391 (E.D.Tenn.1989), for the proposition that "a review of white/white elections as well as white/ black elections is necessary to determine the existence of racially polarized voting." Ante at 609 n. 7. What, however, the majority fails to say is that the district court made this remark in the context of “this particular case.” Brown, 722 F.Supp. at 391 (providing overview of elections in Chattanooga and stating that "blacks have ... found themselves having to support white candidates in an effort to achieve a measure of political influence”). See also Sanchez, 875 F.2d at 1496 (affirming district court’s decision to examine elections in which no minority was a candidate because the evidence showed that a candidate could not receive the nomination and support of the Democratic party without receiving minority support). Also, a court's leeway to examine elections in which no minority is a candidate does not mean that a court must examine such elections before a vote dilution claim can be established, and it certainly does not mean that a plaintiff must proffer such evidence in all cases (and on summary judgment). Cf. Jenkins, 4 F.3d at 1129 ("district court may, in its discretion, decide to allow the defendants to introduce evidence on which, if any, white candidates were minority-preferred”) (emphasis added; footnote omitted).

. As I have noted, the County has not even argued that the plaintiffs must submit election data from white/white elections, nor has the County submitted any such data. In short, the County has not shown that the absence of data on white/ white elections means that there is insufficient evidence to support the plaintiffs’ vote dilution claim. Therefore, under basic summary judgment principles, I am at a loss as to how the majority can conclude that the County is entitled to summary judgment because the plaintiffs have not proffered election data from- white/white elections.

. The Court in Gingles did not discuss what level of deference an appellate court is to accord a district court's factual findings on summary judgment. The Court did, however, stress that because of the fact intensive nature of a vote dilution claim, a district court’s factual findings made after trial are subject to the clearly erroneous standard of Rule 52(a). As the Court said:
We reaffirm our view that the clearly-erroneous test of Rule 52(a) is the appropriate standard of appellate review of a finding of vote dilution. As both amended § 2 and its legislative history make clear, in evaluating a statutory claim of vote dilution through districting, the trial court is to consider the “totality of the circumstances” and to determine, based "upon a searching practical evaluation of 'the past and present reality,' ” [S.Rep. No. 417, 97th Cong., 2d Sess. 30 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 208 (footnote omitted)], whether the political process is equally open to minority voters. " 'This determination is peculiarly dependent upon the facts of each case,’ ” Rogers [v. Lodge, 458 U.S. 613, 621, 102 S.Ct. 3272, 3277, 73 L.Ed.2d 1012 (1982)], quoting Nevett v. Sides, 571 F.2d 209, 224 (5th Cir.1978), and requires "an intensely local appraisal of the design and impact” of the contested electoral mechanisms. 458 U.S. at 622 [102 S.Ct. at 3278].
Gingles, 478 U.S. at 79, 106 S.Ct. at 2781 (emphasis added). In the absence of a trial, it is difficult to imagine how the district court can make "a searching practical evaluation of ‘the past and present reality'" to determine who is and who is not a minority-preferred candidate. Without such an evaluation, there is no reason or basis for deferring to the district court's factual findings under the clearly erroneous standard.

. When questioned at his deposition, the plaintiffs' expert fell into somewhat the same trap as the majority and the district court, acknowledging minority-preferred candidates based on election data taken in isolation.

. In Collins II the minority plaintiffs challenged the at-large voting system used to elect the City Council in Norfolk, Virginia. We explained that " ‘[t]he essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred candidates.’ ” Id. at 1236 (quoting Gingles, 478 U.S. at 47, 106 S.Ct. at 2764). We then stated that "[t]he proper identification of minority voters’ 'representatives of their choice' is critical." Id. at 1237. And, we recognized that the plaintiffs' primary complaint was not that minority voters were unable to elect their first choice to the city council, but rather that the at-large voting system prevented minority voters from electing a second preferred candidate as well. Id. at 1240 ("In the context of this case it is necessary to apply Gin-gles ' teaching to the black community’s attempt to elect a second black councilman.”). For this reason alone, the majority is wrong to say that Collins II left open the question of how to treat second- and third-place finishers when the minority’s first choice is successful. See ante at 614. Because minority voters in Norfolk were able to elect one candidate, Collins II clearly addresses the situation where there is a successful minority-preferred candidate.

. The flaw in .the majority's approach is illustrated by the following hypothetical. An at-large election for four slots is held. There are eight candidates. Candidate number 1 wins with 99 percent of the minority vote; candidate number 2 loses with 95 percent of the minority vote; candidate number 3 wins with 51. percent of the minority vote; candidate number 4 wins with 20 percent of the minority vote; candidate number 5 loses with 15 percent of the minority vote; candidate number 6 loses with 10 percent of the minority vote; candidate number 7 loses with 5 percent' of the minority vote; and candidate number 8 wins with 3 percent of the minority vote. According to the majority, we must automatically treat candidate number 3 as minority preferred even though that candidate received far less support than candidate number 1 or candidate number 2. Also, according to the majority, there is a presumption that candidate number 4 is minority preferred even though that candidate received the support of only one in five minority voters. That cannot be right. It also directly conflicts with our holding in Collins II, because as I have previously noted, see supra at 627 n. 7, in Collins II (as in the above hypothetical), the minority was successful in electing its first, candidate of choice. See 883 F.2d at 1240.

. Obviously, while we should treat the defeat of a minority-preferred candidate in a primary as a defeat for purposes of determining whether Cin-gles ' third precondition has been met, we should not treat the success of a minority-preferred candidate in receiving his or her party's nomination as a success for purposes of the same inquiry. Only if a minority-preferred candidate is actually elected has the minority succeeded in the electoral process. Winning the primary is all to the good, but without winning the general election, white majority bloc voting may have, still succeeded in defeating the minorily-preferred candidate or candidates.

. In Jenkins the Third Circuit outlined the following non-exhaustive list of factors that a court should examine when deciding whether a white candidate may properly be considered minority preferred:
One relevant consideration is the extent to which the minority community can be said to have sponsored the candidate. In determining whether the minority community sponsored the candidate, the court should look to the level of minority involvement in initially advancing the particular candidate and in conducting or financing that candidate's campaign.
Additionally, the attention which the candidate gave to the particular needs and interests of the minority community, including the extent to which the candidate campaigned in predominately minority areas or addressed predominately minority crowds and interests, may be relevant factors.
Another relevant consideration would be the rates at which black voters turned out when a minority candidate sought office as compared to elections involving only white candidates. Finally, bearing in mind the disincentives that may exist for minority candidates to seek office, the extent to which minority candidates have run for office and the ease or difficulty with which a minority candidate can qualify to run for office may be relevant considerations.
4 F.3d at 1129 (citations omitted).

. Evidently, however, under the views expressed in the concurring opinion such a system would not violate the law. Of course, to reach that conclusion we would have to read the Voting Rights Act out of existence, something I do not believe that the Supreme Court has done in Bush v. Vera, — U.S.-, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996), Shaw, supra, or Miller, supra. Indeed, I know of nothing unconstitutional about Congress forbidding electoral schemes that “are not equally open” and that operate to provide minority members with "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b). Likewise, there is nothing unconstitutional about requiring the trial court “to consider the totality of the circumstances and to determine, based upon a searching practical evaluation of the past and present reality, whether the political process is equally open to minority voters.” Gingles, 478 U.S. at 79, 106 S.Ct. at 2781 (citation and internal quotes omitted). While we, as the appellate court, might therefore be faced with hard questions on review (though I doubt that they are “impenetrable” ones), we must nonetheless decide whether the trial court has correctly followed the law — even when it is a law that we might think unwise or unnecessary in today’s world. And I must respectfully differ with my concurring colleague if he regards that as an “intensely race-conscious approach.” See ante at 618.